PER CURIAM.
Plaintiff Rist appeals from a summary final judgment for the defendants, Florida Power & Light Company and Northside Center, Inc.
The allegations contained in plaintiff’s amended complaint were summarized in prior appeal. See Rist v. Northside Center, Inc., Fla.App.1968, 210 So.2d 483.
The facts as shown by the depositions, exhibits, and affidavits reveal that the plaintiff was a 52 year old man who was a high school graduate and had taken courses in college in engineering, electricity and radio but who had not graduated from college. He had worked for about one year as a repairman on large outdoor electrical clocks mounted on towers. He had worked in construction crews and had done general repair work, including electrical and worked around power lines.
*362 He was engaged by the manager of Northside to paint the light standards at the Northside Shopping Center at a set amount for each standard and had been doing this work for several days prior to his accident. All of the light standards were of the same type, size and height, each having a vertical post, with extended mast arm on the end of which was a globe enclosing a bulb and metal cover. The standard post was just under twenty seven feet high, while the top of the lamp cover was about twenty eight and one-half feet above ground.
In painting each standard, plaintiff utilized a scaffold-ladder device, made of aluminum, which consisted of a ladder, based on a supporting platform, planted on wheels, with extending supporting braces to the ground, and a railed platform at the top of the ladder. The bottom of the upper platform was elevated to a height a little below the top of the standard post, and plaintiff’s head was always just a little higher than the mast arm of each street light standard he painted. In painting each standard, plaintiff always tied the scaffold device to the side of the standard post with a chain.
He painted each standard beginning with the extremity of each mast arm, near the enclosing globe cover, using a long handled brush-device consisting of a regular paint brush, the handle of which was jammed into a hollow metal pipe. The long handled brush-device was over five feet in length, and when standing on the upper platform, he had to make a full extension of his arm and the long handled brush to reach the extremity of the mast arm. He used an open paint container which he positioned on the upper platform in front of him into which he would dip the brush and from which he would extend the long handled brush out to the extremity of the mast arm. The standard he was working on at the time of the accident was located on the north side of the shopping center parking lot, behind Howard Johnson’s Restaurant, which was on the corner of N.W. 27th Avenue and 84th Street. The mast arm of this standard extended toward the west, parallel with 84th Street. North of this standard and adjacent to the north edge of the parking lot along 84th Street were overhead distribution power lines of Florida Power & Light providing electrical service to Howard Johnson’s Restaurant and the traffic light at N.W. 84th Street and 27th Avenue. On the first pole east of the standard where the accident occurred and approximately 78 feet away were large transformers from which service lines ran into the Howard Johnson Restaurant. The power wire closest to the light standard in question was over thirty one feet high, over three feet in a straight line distance from the mast arm of the light standard and about 0.7 feet north of the standard itself.
Before ascending to paint this standard plaintiff saw the power wires north of it and decided he would just smear a little paint on its south side and not even attempt to paint the north side, even if he didn’t get paid for that particular standard. In his deposition he said:
“ * * * I had my mind made up on this pole, because if they didn’t pay me it didn’t make any difference. It didn’t look right. It looked kind of crowded. I saw the wires there.
* * * * *
Q. Tell me what you did next after you got up on the platform by this pole.
A. Well, I had it up and I tied it up, and I looked at it. It looked kind of crowded. I said, ‘Gee, I am not going to bother with that post.’ I had the ladder up, already fixed, and I said, T will just smear it up on one side, and I am not going to bother with the other.’ It didn’t look right to me.
Q. Why didn’t it look right to you?
A. I saw a bunch of wires. All I was interested in was getting these posts done.
* * * * * *
*363 Q. You indicated you didn’t seem too much concerned about whether you gave this particular pole a good paint job, or not.
A. Exactly right.
Q. Why?
A. On the other side I went up there and it looked kind of crowded — a bunch of wires. I said I am not going to bother with it, for some reason. I wasn’t even concerned what type of wires, but I didn’t want to go out because it didn’t look right to me. I said, ‘I am not going to be bothered with it.’
Q. You were concerned about them enough so that you didn’t want to work on that side of the post.
A. That’s right.
Q. And you were concerned with them enough so that you didn’t want to get into contact with them.
A. That’s right.
>{< ;}c iji * s{c *
Q. You were attempting, so far as you were concerned, to avoid any contact with them?
A. Yes.”
sfi * * * jK
Although it was a “windy” day the wires appeared to be stationary from the ground. Plaintiff went up the south side of the standard pole and, feeling “perfectly safe”, commenced his work.
While doing his work, he kept his attention, without worrying about the wires on the north side of the standard, upon his work and the problems involved in maintaining himself on his platform. It became somewhat windier after he had climbed the pole but, engaged as he was in his work, he did not again look at the wires and never actually saw them move from their position at the north of the standard.
The accident occurred as Rist was either putting in or taking out his brush-pipe “straight up and down” when he heard a “big bang”, apparently and allegedly caused by a contact between the power company’s southernmost uninsulated 7,200-volt conductor and the metal paint brush extension.
Plaintiff did not see what happened to cause this bang, and has no knowledge of actually what did happen; he saw no flash of light or anything to indicate an electrical contact or transmission to his painting tool. There were no eye witnesses to the accident.
The investigating officer stated that after he had arrived at the scene, he noted that gusts of wind were carrying the southernmost wire over the top of the standard from the north side to the south side. The extension pole on plaintiff’s brush contained a burn mark near its end and it is argued that the wire had been blown by the wind so as to strike the extension pole as it was being held in a vertical position by the plaintiff.
Plaintiff argues that he ascended the south side of the light standard and that in contrast to the north side it seemed perfectly safe. He says he was injured by a subsequently arising condition of which he never became aware, i. e., the gusty wind which blew the power wire over from the dangerous to the safe side of the standard.
Plaintiff was a man who had some degree of experience in dealing with electricity and power lines. He also had some degree of experience in working on outdoor electrical clocks mounted on towers. He knew it was windy and knew that there was more wind at the top of his painting platform. Assuming arguendo, that the wind blew the power wire across the top of the standard and that the wire came into contact with plaintiff’s metal paint brush extension pole when it was raised over the top of the light standard, it appears that he voluntarily placed himself in a position of known danger when *364 he had actual knowledge of the power wires, their location, and the weather conditions prevailing at the top of his platform. Under these facts it appears that plaintiff was contributorily negligent as a matter of law. See Richmond v. Florida Power & Light Co., Fla.1952, 58 So.2d 687; and Kerben v. Florida Power & Light Co., Fla.App.1961, 134 So.2d 280.
The summary final judgment for the defendant Northside is also affirmed. See Quinnelly v. Southern Maid Syrup Company, Fla.App.1964, 164 So.2d 240.
Affirmed.